1  KAMALA D. HARRIS
   Attorney General of California
2  SARA J. DRAKE
   Senior Assistant Attorney General
3  NEIL D. HOUSTON
   Deputy Attorney General
4  State Bar No. 168058
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 322-5476
     Fax: (916) 327-2319
7    E-mail: Neil.Houston@doj.ca.gov
   *Attorneys for Defendant*
8

9              UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13
   **ALTURAS INDIAN RANCHERIA, a**            Case No. _____
14 **federally recognized Indian tribe,**
                                              State Court Case No. 34-2011-00108093
15                               Plaintiff,   (Sacramento County Case)

16            v.                              **NOTICE OF REMOVAL OF CIVIL
                                              ACTION**
17
   **CALIFORNIA GAMBLING CONTROL**            28 U.S.C. §1446(a)
18 **COMMISSION, an agency of the State of**
   **California,**
19
                                Defendant.    **PDF 2 of 3**
20

21

22        NOTICE OF REMOVAL to the honorable judges of the United States District Court for the

23 Central District of California:

24        Removing party, the California Gambling Control Commission (Defendant), by the

25 undersigned attorney, respectfully shows the Court:

26        1.      Removing party is a defendant in the above captioned action.

27

28
                                              1

# EXHIBIT D

1 | Robert A. Rosette (CA SBN 224437)
2 | Richard J. Armstrong (CA SBN 225191)
   | Nicole St. Germain (CA SBN 261356)
3 | ROSETTE, LLP
   | ATTORNEYS AT LAW
4 | 193 Blue Ravine Rd., Suite 255
   | Folsom, California 95630
5 | (916) 353-1084 (Office)
   | (916) 353-1085 (Fax)
6 | armstrong@rosettelaw.com
   | nstgermain@rosettelaw.com
7 |
   | Attorneys for Plaintiff
8 | ALTURAS INDIAN RANCHERIA,
   | a federally recognized Indian tribe
9 |

10 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11 | **FOR THE COUNTY OF SACRAMENTO**

12 |

| | |
|---|---|
| ALTURAS INDIAN RANCHERIA , a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>vs.<br><br>CALIFORNIA GAMBLING CONTROL COMMISSION, an agency of the State of California,<br><br>Defendant. | Case No.:<br><br>**EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF RICHARD J. ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER**<br><br>Date:<br>Time:<br>Dept: |

Plaintiff, the Alturas Indian Rancheria, a federally recognized Indian tribe ("Plaintiff" or "Tribe"), by and through counsel undersigned, hereby apply ex parte for a Temporary Restraining Order and Order to Show Cause Regarding a Preliminary Injunction to enjoin Defendant, the California Gambling Control Commission ("the Commission" or "CGCC"), the Commission's

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

agents, employees, and attorneys, as well as other involved California state agencies, including the California State Controller's Office from distributing funds from Plaintiff's Revenue Sharing Trust Fund account administered by the CGCC following the Commission's July 28, 2011 decision to recognize and honor a recent Notice of Levy received by the Internal Revenue Service purporting to have a claim to Tribal funds.  Unless the relief sought hereby is granted, great and irreparable injury will result to the Plaintiff.

This application is based on Plaintiff's Complaint filed herein based on the Commission's recent July 28, 2011 actions and the individual Commissioners decision to honor the IRS levy against the Tribe's RSTF moneys, together with the Memorandum of Points and Authorities, the Declaration of Richard Armstrong and the Declaration of Philip Del Rosa attached hereto.

Respectfully submitted,

ROSETTE, LLP
ATTORNEYS AT LAW

Dated: August ____, 2011                    By: _____
                                                 Nicole St. Germain
                                                 Attorney for Plaintiff

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff, the Alturas Indian Rancheria ("Plaintiff" or "Tribe"), a federally recognized Indian tribe, by and through counsel undersigned, hereby submits this Memorandum of Points and Authorities in Support of its Ex Parte Application for Order to Show Cause and Temporary Restraining Order to enjoin Defendant, the California Gambling Control Commission ("the Commission" or "CGCC"), the Commission's agents, employees, and attorneys, as well as other involved California state agencies, including the California State Controller's Office from distributing funds from Plaintiff's Revenue Sharing Trust Fund account administered by the CGCC following the Commission's July 28, 2011 decision to recognize and honor a recent Notice of Levy received by the Internal Revenue Service ("IRS") purporting to have a claim to Tribal funds. Unless the relief sought hereby is granted, great and irreparable injury will result to the Plaintiff. Plaintiff respectfully requests that this Order to Show Cause and Temporary Restraining Order be granted, pursuant to California Code of Civil Procedure § 527, and a Hearing to Show Cause Regarding a Preliminary Injunction be set to avoid additional undue hardship to Plaintiff.

**STATEMENT OF FACTS**

Plaintiff Tribe is a federally recognized Indian tribe that is entitled to monetary distributions from the Revenue Sharing Trust Fund ("RSTF"), a fund that compensates Non-Compact Indian tribes in California pursuant to tribal-state compacts entered into between the State of California and tribes engaged in class III gaming. *See* Declaration of Phillip Del Rosa in Support of Ex Parte Application ("Del Rosa Decl.") ¶ 2; Exhibit A to Del Rosa Decl., Federal, Volume 74, No. 153, August 11, 2009. The Tribe entered into a tribal-state compact with the State in 1999 ("Compact"), however because the Tribe's casino operates less than 350 devices, it is considered a Non-Compact Tribe pursuant to the terms of the Compact. *See* Exh. B to Del Rosa Decl., 1999 Tribal-State Compact Section 4.3.2. "The RSTF is a fund created by the Legislature and administered by the California Gambling Control Commission, as trustee, for the receipt, deposit, and distribution of monies paid pursuant to this Section 4.3.2." *See* Exh. B to

3

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

Del Rosa Decl., Compact Section 4.3.2(a)(ii).

At the beginning of 2010, the CGCC determined that a leadership dispute within the Tribe required that the Commission withhold RSTF distributions to the Tribe pending resolution of the dispute. Del Rosa Decl. ¶ 3; Exh. C to Del Rosa Decl. The Tribe has, at all times, remained eligible to receive funds; however since the quarter ended March 31, 2010, the Commission has held all disbursements to which the Tribe is entitled. Del Rosa Decl. ¶ 4.

Plaintiff was notified on or about July 20, 2011, that the IRS had contacted the CGCC seeking to levy against the Tribe's RSTF funds. Del Rosa Decl. ¶ 8. The Commission received two Notices of Levy and responded via written correspondence addressing several unclear issues with the Notices of Levy including an incorrect address and incorrect identifying number. Del Rosa Decl. ¶ 8; Exh. B to Armstrong Decl. The issue was added to the CGCC's meeting agenda for July 28, 2011. The Notices of Levy were discussed at the monthly meeting. The Tribe, having no knowledge of what the Notices of Levy correspond to and suspecting they do not pertain to Tribal business enterprise, requested additional time to investigate and settle the matter by directly reaching out to the IRS as part of its government-to-government relationship it shares with the United States and the State of California. Del Rosa Decl. ¶ 10; Declaration of Richard J. Armstrong ("Armstrong Decl.") ¶ 6. After limited discussion in open session and no disclosure of information that the CGCC may have obtained from the IRS, the CGCC Commissioners voted unanimously to recognize the IRS's Notices of Levy and move forward to allow the IRS to execute on the two levies. Armstrong Decl. ¶ 7.

At the conclusion of the July 28, 2011 meeting, the Commissioners directed their general counsel to facilitate the execution of the IRS levies, despite the fact that there has been no determination of what the levies are for or why they need to executed as soon as possible. Execution of the levies against the Tribe's RSTF funds will result in those funds being distributed to the IRS without any determination as to the basis of the levies and a permanent loss of desperately needed funds to support the Tribe's government. Del Rosa Decl. ¶¶ 5, 10. As such, Plaintiffs respectfully request that this Court issue a Temporary Restraining Order to enjoin the

4

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

1  processing of the Notices of Levy to prevent execution and distribution of the Tribe's RSTF funds

2  and schedule an Order to Show Cause hearing regarding a Preliminary Injunction.

**ARGUMENT**

3

4        The purpose of temporary restraining orders and preliminary injunctions is to preserve the

5  status quo in order to determine the merits of the underlying action.  *Wind v. Herbert* (1960) 186

6  Cal.App.2d 276.  Pursuant to C.C.P. § 527(a), a preliminary injunction may be granted when a

7  party can "show satisfactorily that sufficient grounds exist thereof."  C.C.P. § 526 allows, in part,

8  injunctive relief when it appears that: (1) by the complaint, the plaintiff is entitled to the relief

9  demanded and relief consists of restraining the commission of the act complained of; (2) when it

10  appears by complaint or affidavit that the commission of an act "would produce waste, or great or

11  irreparable injury, to a party to the action"; (3) when it appears that a party threatens or is about to

12  "act in violation of the rights of another party to the action respecting the subject of the action and

13  tending to render the judgment ineffectual"; and (4) "when pecuniary compensation would not

14  afford adequate relief" or it would be extremely difficult to valuate adequate relief.  C.C.P. §

15  527(a)(1)-(5).  Plaintiff meets each of these elements, and, accordingly, is entitled to a temporary

16  restraining order and order to show cause regarding a preliminary injunction.

17  **A.  Plaintiffs Are Likely to Be Successful on the Merits of Their Complaint.**

18        As alleged in the Complaint, the Tribe has a vested interest in the RSTF monies being

19  held by the CGCC as a trustee for the Tribe and a strong likelihood of success on the merits.  The

20  Tribe has filed its complaint alleging a breach of the terms of it Compact, which specifically

21  identifies the CGCC's obligations to act as trustee for the Tribe's RSTF monies.  *See* Del Rosa

22  Decl., Exh. B.  Pursuant to the Tribe's Compact, as well as all other tribal-state compacts in

23  California:

24        [p]ayments made to Non-Compact Tribes shall be made quarterly and in equal
        shares out of the Revenue Sharing Trust Fund.  The Commission shall serve as the
25        trustee of the fund.  **The Commission shall have no discretion with respect to
        the use or disbursement of the trust funds.  Its sole authority shall be to serve**
26        **as a depository of the trust funds and to disburse them on a quarterly basis to**
        **Non-Compact Tribes.**
27

28  *See* Del Rosa Decl., Exh. B, Compact § 4.3.2.1(b) (emphasis added).

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD
ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

Based on the CGCC's clear trustee duties, and its inability to exercise any discretion regarding the use or disbursement of RSTF funds, the CGCC is breaching the terms of the Tribe's Compact by proceeding with its decision to recognize and process the IRS's Notices of Levy and plan to disburse funds out of the Tribe's RSTF monies being held for the benefit of the Tribe. Because the CGCC is acting far outside the scope of its authority as authorized by the Compact, Plaintiff has a very strong likelihood of success on the merits of its breach of contract claim.

**B. Disbursement of the RSTF Monies Would Produce Great or Irreparable Injury to the Tribe.**

The Tribe depends on the quarterly distributions of RSTF monies by the CGCC. It is already under tremendous strain now that the CGCC has decided to withhold quarterly distributions pending resolution of the perceived leadership dispute within the Tribe. Allowing the IRS to execute its Levies against the Tribe's RSTF funds, over which the Commission acts as a trustee, without a proper finding regarding the origination of the Tribe's supposed tax liability of the Tribe would produce great and irreparable injury to the Tribe.

Plaintiff requests the Court order a Temporary Restraining Order and schedule a hearing for an Order to Show Cause for a Preliminary Injunction because the potential harm to Plaintiff is considerable given the fact that the Tribe is dependent on its RSTF funds and that it will be left without reasonable recourse if the CGCC allows for the distribution of RSTF monies to the IRS and it is later determined that the existing tax liability the IRS claims is not, in fact, the result of a Tribal enterprise. Given the issues revolving around the Tribe's leadership dispute, real questions of fact exist regarding whether businesses are, in fact, Tribal enterprises. The CGCC is well aware of these issues; such problems were a justification for withholding the Tribe's RSTF monies in the first place.

The CGCC has already indicated its intent to facilitate the distribution of the Tribe's funds to satisfy the IRS's levies, and representations from the Commission's general counsel are that such disbursement can be expected in any time between a few days a few weeks. Armstrong Decl. ¶ 9. Irreparable harm will result if such funds are disbursed without learning the true nature

6

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

1  of the tax liability and whether or not it actually stems from a Tribal enterprise.  This harm

2  necessitates the Court's grant of a Temporary Restraining Order to protect Tribal assets from

3  being distributed without first learning the source and true nature of the tax liability.

4

5      **C.**  **The Commission Has Indicated its Intent to Process the IRS's Notices of Levy and**
   **Make a Disbursement of RSTF Funds to the IRS Very Shortly, and its General**

6          **Counsel Has Communicated that the Commission Would Only Consider Keeping the**
   **Tribe Apprised of its Communication with the IRS Regarding Disbursement of**

7          **RSTF Monies.**

8        As discussed above, the threat of great and irreparable harm is very immediate, and would

9  render a judgment on the merits of Plaintiff's complaint ineffectual.  C.C.P. § 526(3).  Following

10  the July 28, 2011 CGCC meeting in which the Commissioners voted unanimously to recognize

11  the IRS's Notices of Levy and disburse funds pursuant to such levies, the CGCC's general

12  counsel indicated that carrying out the Commissions' directive would take anywhere from a few

13  days to a few weeks.  Armstrong Decl. ¶ 9.  Additionally, when asked to keep the Tribe apprised

14  of developments and communication with the IRS, including being copied on correspondence the

15  CGCC has with the IRS, counsel indicated that he would consider it.  Armstrong Decl. ¶ 8.

16  Given the timeline and urgency the CGCC has assessed with this matter, and the apparent secrecy

17  the Commissions' counsel wishes to have with the IRS regarding funds that belong to the Tribe,

18  the threat of the disbursement being made before adjudication of the merits of Plaintiff's

19  complaint is exceedingly high, and sufficiently immediate to warrant issuance of a TRO and

20  scheduling of a hearing regarding a preliminary injunction.

21      **D.  Pecuniary Compensation Would Not Afford Plaintiffs Adequate Relief.**

22        Finally, C.C.P. § 526(a)(4)-(5) contemplates the practicality of monetary damages or

23  pecuniary compensation and that an injunction may be granted when that remedy is deemed

24  inadequate.  Here, the Tribe will suffer far beyond the pecuniary loss of the funds disbursed out of

25  the RSTF because funds will be distributed, against the CGCC's responsibilities as the Tribe's

26  trustee and the plain language of the Compact, will serve as an indication from the CGCC that

27  such levies and tax liability, and in turn the businesses associated with such tax liabilities, are

28

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

7

Tribal enterprises. Given the lack of clarity in the IRS's request, and the letter with the incorrect address and identifying number, there is no legitimate basis upon which the funds should be disbursed without first learning the genesis of the liability and allowing the Tribe to exercise its government-to-government relationship with the United States to investigate the matter. To this end, the Tribe submitted a letter to the IRS dated July 25, 2011, reaching out and wishing to help clarify the issue with the IRS in its capacity as a Tribal government. *See* Exh. D to Del Rosa Decl. The CGCC is apparently uninterested in allowing the Tribe to address its own issues. This is an imposition on the Tribe's sovereignty and its ability to govern itself. Additionally, it will create a precedent that the Tribe is liable for tax liability that may not even be the result of Tribal business enterprise. There is no reason that additional investigation and communication with the IRS cannot take place prior to the CGCC distributing the Tribe's RSTF monies. This additional, non-pecuniary damage to the Tribe's ability to govern itself supports the issuance of a TRO.

Because Plaintiff can clearly demonstrate many of the enumerated factors justifying an injunction, and because Plaintiff can show on the basis of the complaint and the Declaration of Phillip Del Rosa and Declaration of Richard J. Armstrong that there is a real and cognizable threat that CGCC will process the IRS's Notices of Levy and disburse the Tribe's RSTF funds without any further investigation, causing great and irreparable harm will result for which there is no adequate or easily determinable monetary remedy. Further, Plaintiff has demonstrated a likelihood of success on the merits based on the Commission's breach of its responsibility as trustee of the Tribe's RSTF funds. Pursuant to C.C.P. §§ 526-527, the Tribe is entitled to the requested Temporary Restraining Order and the Court should grant its request and set a hearing date for an Order to Show Cause for a Preliminary Injunction.

## PRAYER FOR RELIEF

For the foregoing reasons, the Tribe respectfully request that this Court issue a Temporary Restraining Order and set an Order to Show Cause hearing regarding a preliminary injunction to enjoin Defendant, the California Gambling Control Commission from disbursing the Tribe's

8

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD
ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

1    RSTF monies to satisfy levies noticed by the IRS.

2

3                                    Respectfully submitted,

4

5                                    ROSETTE, LLP
                                     ATTORNEYS AT LAW
6

7

8    Dated: August ⎯1⎯, 2011         By:_____
                                     Nicole St. Germain
9                                    Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 235
Folsom, California  95630

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD
ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

**DECLARATION OF PHILLIP DEL ROSA SUPPORT OF EX PARTE APPLICATION**

In support of this application, I declare that I have personal knowledge of the facts giving rise to this application, and if called as a witness I can and will testify truthfully to the following:

1. The Alturas Indian Rancheria (hereinafter the "Tribe") is a federally recognized Indian tribe that possesses tribal sovereignty and exercises a government-to-government relationship with the United States. (See attached as Exhibit A, a true and correct copy of the United States Federal Register, Volume 74, No. 153, August 11, 2009.)

2. The Tribe entered into a tribal-state compact ("Compact") with the State of California in 1999 and is eligible to receive Revenue Sharing Trust Fund ("RSTF") monies pursuant to the Compact because the Tribe's casino operates less than 350 gaming devices. (See attached as Exhibit B, a true and correct copy of the tribal-state Compact between the Alturas Indian Rancheria and the State of California.)

3. Beginning with the RSTF distribution for quarter ended March 31, 2010, the California Gambling Control Commission ("CGCC") decided to withhold RSTF funds pending resolution of a Tribal leadership dispute. (See attached as Exhibit C, a true and correct copy of the California Gambling Control Commission memorandum, dated April 28, 2010, indicating the withholding of the Tribe's RSTF monies.)

4. The CGCC has withheld the Tribe's RSTF allocation every quarter since the first quarter of 2010, however at all times the Tribe has remained eligible to receive funds, and such funds have been held in trust for the Tribe.

5. The Tribe is dependent on RSTF funds to facilitate its government, and has sustained hardship since distribution of the funds has ceased. If the funds to which the Tribe is entitled are given to the IRS, the Tribe will be unable to use the funds for vital government purposes and will be severely harmed.

6. In light of the leadership dispute within the Tribe, the Bureau of Indian Affairs has designated the electees to the Tribe's 2008 Business Committee as the governing body responsible for carrying out Tribal governance and conducting its government-to-government relationship with the United States. The CGCC has been made aware of the

10

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

Bureau of Indian Affairs' designation and recognition of the 2008 Business Committee.

7.  As the Chairman of the 2008 Business Committee, I am the Tribe's representative and spokesman.

8.  On or about July 20, 2011, I became aware of the Internal Revenue Service's Notices of Levy that had been served on the CGCC as trustee of the Tribe's RSTF funds.  Such notification clearly showed that the listed address and identifying number were incorrect and did not match the Tribe's accurate information.

9.  In an attempt to exercise the Tribe's government-to-government relationship with the United States, I sent a letter to the IRS dated July 25, 2011, seeking to clarify the nature of the alleged tax liability, to address inaccuracies in the Notices, and to indicate the Tribe's desire to investigate the origin and nature of the tax liability, as I have never before heard of outstanding tax liability warranting a Notice of Levy.  A copy was sent to the CGCC. (See attached as Exhibit D, a true and correct copy of the July 25, 2011 letter to Ms. Fara Mills of the Internal Revenue Service.)

10. I have serious doubts as to the nature and origin of the tax liability, as I do not believe it is the result of Tribal business enterprise, and as the Chairman of the 2008 Business Committee, I believe it is in the best interest of the Tribe to investigate the facts behind the Notices of Levy to ensure the protection of Tribal assets.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: August 1, 2011

Phillip Del Rosa

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

## DECLARATION OF RICHARD J. ARMSTRONG IN SUPPORT OF EX PARTE APPLICATION

In support of this application, I declare that I have personal knowledge of the facts giving rise to this application, and if called as a witness I can and will testify truthfully to the following:

1. I am a duly licensed attorney eligible to practice law in the State of California.

2. I am of counsel with the firm Rosette, LLP, a firm that represents the Alturas Indian Rancheria ("Tribe") on various matters.

3. On or about July 20, 2011, I learned that the Internal Revenue Service had served Notices of Levy on the California Gambling Control Commission ("CGCC") requesting disbursement from the Tribe's Revenue Sharing Trust Fund ("RSTF") monies to satisfy supposedly existing tax liability.  Through my representation of the Tribe, I received copies of the two Notices of Levy the IRS provided the CGCC.  (See attached as Exhibit A, a true and correct copy of the two Notices of Levy from the IRS to the CGCC.)

4. I received a copy of a July 19, 2011 letter that the CGCC sent to the IRS seeking clarification on issues and requesting additional information to substantiate the Notices of Levy dated June 24, 2011 and July 5, 2011 (See attached as Exhibit B, a true and correct copy of the July 19, 2011 letter from the CGCC to the to Ms. Fara Mills of the Internal Revenue Service.)

5. I attended the CGCC's regularly scheduled meeting on July 28, 2011.  The Tribe's Notices of Levy issue had been added to the agenda for discussion.

6. At the meeting, I presented information to the CGCC's Commissioners and requested additional time to investigate the nature of the tax liability and the origin of such liability and allow the Tribe the opportunity to exercise its government to government relationship by way of direct communication with the Internal Revenue Service.  I informed the CGCC's Commissioners that, in light of the Tribal leadership dispute of which they are well aware, there was a possibility that such tax liability was not derived from Tribal business enterprise, and that as trustees of the Tribe's RSTF monies, it would behoove the

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

CGCC to allow additional time to protect the Tribe's interest and exercise its duties as trustee.

7. After limited discussion, the Commissioners voted unanimously to move forward expeditiously with the processing and disbursement of funds from the Tribe's RSTF monies to satisfy the existing IRS levies.

8. Following the meeting, I spoke with Joginder Dhillon, the CGCC's general counsel, and requested that the Tribe be carbon copied on additional correspondence the CGCC may have with the IRS, and to be apprised of any continuing developments regarding the levies. He indicated that he would think about it.

9. When I asked Mr. Dhillon about the timeline he expected for processing and disbursement of the Tribe's funds to the IRS, he indicated that it could be sometime between a few days and a few weeks.

10. Following the July 28, 2011 meeting, I initiated contact with the Internal Revenue Service on behalf of the Tribe as their legal counsel to try to discern the origin of these Notices of Levy. I filled out and submitted the required Form No. 2848 Power of Attorney as required by the IRS. Subsequent to the IRS receiving such designation, I have made attempts to reach the IRS on Friday, July 29, 2011, and Monday August 1, 2011, but my messages remain unreturned.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: August 1, 2011

Richard J. Armstrong

Rosette, LLP
Attorneys at Law
193 Blue Ravine Road
Suite 255
Folsom, California 95630

EX PARTE APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF RICHARD ARMSTRONG AND DECLARATION OF PHILIP DEL ROSA IN SUPPORT THEREOF; PROPOSED ORDER

# EXHIBIT A

**40218**     Federal Register / Vol. 74, No. 153 / Tuesday, August 11, 2009 / Notices

of response is on occasion; and the estimated time needed to prepare the response is .05 hour per response.

*Status of the proposed information collection:* Extension of a currently approved collection.

**Authority:** The Paperwork Reduction Act of 1995, 44 U.S.C., Chapter 35, as amended.

Dated: August 4, 2009.

**Ronald Y. Spraker,**

*Acting General Deputy Assistant Secretary for Housing—Deputy Federal Housing Commissioner.*

[FR Doc. E9–19240 Filed 8–10–09; 8:45 am]

**BILLING CODE 4210-67-P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

[Docket No. FR–5281–N–62]

**Application for HUD/FHA Insured Mortgage "Hope for Homeowners"**

**AGENCY:** Office of the Chief Information Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below has been submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

This information is collected on new mortgages offered by FHA approved mortgagees to mortgagors who are at risk of losing their homes to foreclosure. The new FHA insured mortgages refinance the borrowers' existing mortgage at a significant write-down. Under the program the mortgagors share the new equity and future appreciation with FHA.

**DATES:** *Comments Due Date:* September 10, 2009.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB approval Number (2502–0579) and should be sent to: HUD Desk Officer, Office of Management and Budget, New Executive Office Building, Washington, DC 20503; fax: 202–395–5806.

**FOR FURTHER INFORMATION CONTACT:** Lillian Deitzer, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail Lillian Deitzer at *Lillian_L._Deitzer@HUD.gov* or telephone (202) 402–8048. This is not a toll-free number. Copies of available documents submitted to OMB may be obtained from Ms. Deitzer.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that the Department of Housing and Urban Development has submitted to OMB a request for approval of the Information collection described below. This notice is soliciting comments from members of the public and affecting agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

This notice also lists the following information:

*Title of Proposal:* Insured Mortgage "Hope for Homeowners".

*OMB Approval Number:* 2502–0579.

*Form Numbers:* HUD–92900–H4H, HUD–92915–H4H, HUD–92916–H4H, and HUD–92917–H4H.

*Description of the Need for the Information and its Proposed Use:* This information is collected on new mortgages offered by FHA approved mortgagees to mortgagors who are at risk of losing their homes to foreclosure. The new FHA insured mortgages refinance the borrowers' existing mortgage at a significant write-down. Under the program the mortgagors share the new equity and future appreciation with FHA.

*Frequency of Submission:* On occasion.

| | Number of respondents | Annual responses | × | Hours per response | = | Burden hours |
|---|---|---|---|---|---|---|
| Reporting Burden ............... | 8,000 | 158 | | 0.723 | | 915,040 |

*Total Estimated Burden Hours:* 915,040.

*Status:* Extension of a currently approved collection.

**Authority:** Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. 35, as amended.

Dated: August 4, 2009.

**Lillian Deitzer,**

*Departmental Reports Management Officer, Office of the Chief Information Officer.*

[FR Doc. E9–19243 Filed 8–10–09; 8:45 am]

**BILLING CODE 4210-67-P**

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Indian Affairs**

**Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the current list of 564 tribal entities recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of their status as Indian tribes. The list is updated from the notice published on April 4, 2008 (73 FR 18553).

**FOR FURTHER INFORMATION CONTACT:** Daisy West, Bureau of Indian Affairs, Division of Tribal Government Services, Mail Stop 4513–MIB, 1849 C Street, NW., Washington, DC 20240. Telephone number: (202) 513–7641.

**SUPPLEMENTARY INFORMATION:** This notice is published pursuant to section 104 of the Act of November 2, 1994 (Pub. L. 103–454; 108 Stat. 4791, 4792), and in exercise of authority delegated to the Assistant Secretary—Indian Affairs under 25 U.S.C. 2 and 9 and 209 DM 8.

Published below is a list of federally acknowledged tribes in the contiguous 48 states and in Alaska.

Two tribes have been added to the list since the last publication. Federal relations have been reestablished with Wilton Rancheria pursuant to a court-ordered settlement stipulation. The court order was dated June 8, 2009. Direct government-to-government relations were reestablished with the Delaware Tribe of Indians through its

Federal Register/Vol. 74, No. 153/Tuesday, August 11, 2009/Notices **40219**

reorganization under federal statute, the Oklahoma Indian Welfare Act. This reorganization of its tribal government, separate from that of the Cherokee Nation, Oklahoma, is pursuant to a Memorandum of Agreement between the two tribes. The reorganization was effective May 27, 2009.

Other amendments to the list include name changes and name corrections. To aid in identifying tribal name changes, the tribe's former name is included with the new tribal name. To aid in identifying corrections, the tribe's previously listed name is included with the tribal name. We will continue to list the tribe's former or previously listed name for several years before dropping the former or previously listed name from the list.

The listed entities are acknowledged to have the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations and obligations of such tribes. We have continued the practice of listing the Alaska Native entities separately solely for the purpose of facilitating identification of them and reference to them, given the large number of complex Native names.

Dated: July 29, 2009.

**Larry Echo Hawk,**
*Assistant Secretary—Indian Affairs.*

**Indian Tribal Entities Within the Contiguous 48 States Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs**

Absentee-Shawnee Tribe of Indians of Oklahoma
Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California
Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona
Alabama-Coushatta Tribes of Texas
Alabama-Quassarte Tribal Town, Oklahoma
Alturas Indian Rancheria, California
Apache Tribe of Oklahoma
Arapahoe Tribe of the Wind River Reservation, Wyoming
Aroostook Band of Micmac Indians of Maine
Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana
Augustine Band of Cahuilla Indians, California (formerly the Augustine Band of Cahuilla Mission Indians of the Augustine Reservation)
Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin

Bay Mills Indian Community, Michigan
Bear River Band of the Rohnerville Rancheria, California
Berry Creek Rancheria of Maidu Indians of California
Big Lagoon Rancheria, California
Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California
Big Sandy Rancheria of Mono Indians of California
Big Valley Band of Pomo Indians of the Big Valley Rancheria, California
Blackfeet Tribe of the Blackfeet Indian Reservation of Montana
Blue Lake Rancheria, California
Bridgeport Paiute Indian Colony of California
Buena Vista Rancheria of Me-Wuk Indians of California
Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon
Cabazon Band of Mission Indians, California
Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California
Caddo Nation of Oklahoma
Cahuilla Band of Mission Indians of the Cahuilla Reservation, California
Cahto Indian Tribe of the Laytonville Rancheria, California
California Valley Miwok Tribe, California
Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California
Capitan Grande Band of Diegueno Mission Indians of California: Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California
Catawba Indian Nation (aka Catawba Tribe of South Carolina)
Cayuga Nation of New York
Cedarville Rancheria, California
Chemehuevi Indian Tribe of the Chemehuevi Reservation, California
Cher-Ae Heights Indian Community of the Trinidad Rancheria, California
Cherokee Nation, Oklahoma
Cheyenne and Arapaho Tribes, Oklahoma (formerly the Cheyenne-Arapaho Tribes of Oklahoma)
Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota
Chickasaw Nation, Oklahoma
Chicken Ranch Rancheria of Me-Wuk Indians of California
Chippewa-Cree Indians of the Rocky Boy's Reservation, Montana
Chitimacha Tribe of Louisiana
Choctaw Nation of Oklahoma
Citizen Potawatomi Nation, Oklahoma
Cloverdale Rancheria of Pomo Indians of California

Cocopah Tribe of Arizona
Coeur D'Alene Tribe of the Coeur D'Alene Reservation, Idaho
Cold Springs Rancheria of Mono Indians of California
Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California
Comanche Nation, Oklahoma
Confederated Salish & Kootenai Tribes of the Flathead Reservation, Montana
Confederated Tribes of the Chehalis Reservation, Washington
Confederated Tribes of the Colville Reservation, Washington
Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians of Oregon
Confederated Tribes of the Goshute Reservation, Nevada and Utah
Confederated Tribes of the Grand Ronde Community of Oregon
Confederated Tribes of Siletz Indians of Oregon (previously listed as the Confederated Tribes of the Siletz Reservation)
Confederated Tribes of the Umatilla Reservation, Oregon
Confederated Tribes of the Warm Springs Reservation of Oregon
Confederated Tribes and Bands of the Yakama Nation, Washington
Coquille Tribe of Oregon
Cortina Indian Rancheria of Wintun Indians of California
Coushatta Tribe of Louisiana
Cow Creek Band of Umpqua Indians of Oregon
Cowlitz Indian Tribe, Washington
Coyote Valley Band of Pomo Indians of California
Crow Tribe of Montana
Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota
Death Valley Timbi-Sha Shoshone Band of California
Delaware Nation, Oklahoma
Delaware Tribe of Indians, Oklahoma
Dry Creek Rancheria of Pomo Indians of California
Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada
Eastern Band of Cherokee Indians of North Carolina
Eastern Shawnee Tribe of Oklahoma
Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California
Elk Valley Rancheria, California
Ely Shoshone Tribe of Nevada
Enterprise Rancheria of Maidu Indians of California
Ewiiaapaayp Band of Kumeyaay Indians, California
Federated Indians of Graton Rancheria, California
Flandreau Santee Sioux Tribe of South Dakota
Forest County Potawatomi Community, Wisconsin

**40220**      **Federal Register** / Vol. 74, No. 153 / Tuesday, August 11, 2009 / Notices

Fort Belknap Indian Community of the
Fort Belknap Reservation of Montana
Fort Bidwell Indian Community of the
Fort Bidwell Reservation of California
Fort Independence Indian Community
of Paiute Indians of the Fort
Independence Reservation, California
Fort McDermitt Paiute and Shoshone
Tribes of the Fort McDermitt Indian
Reservation, Nevada and Oregon
Fort McDowell Yavapai Nation, Arizona
Fort Mojave Indian Tribe of Arizona,
California & Nevada
Fort Sill Apache Tribe of Oklahoma
Gila River Indian Community of the Gila
River Indian Reservation, Arizona
Grand Traverse Band of Ottawa and
Chippewa Indians, Michigan
Greenville Rancheria of Maidu Indians
of California
Grindstone Indian Rancheria of Wintun-
Wailaki Indians of California
Guidiville Rancheria of California
Habematolel Pomo of Upper Lake,
California
Hannahville Indian Community,
Michigan
Havasupai Tribe of the Havasupai
Reservation, Arizona
Ho-Chunk Nation of Wisconsin
Hoh Indian Tribe of the Hoh Indian
Reservation, Washington
Hoopa Valley Tribe, California
Hopi Tribe of Arizona
Hopland Band of Pomo Indians of the
Hopland Rancheria, California
Houlton Band of Maliseet Indians of
Maine
Hualapai Indian Tribe of the Hualapai
Indian Reservation, Arizona
Iipay Nation of Santa Ysabel, California
(formerly the Santa Ysabel Band of
Diegueno Mission Indians of the
Santa Ysabel Reservation)
Inaja Band of Diegueno Mission Indians
of the Inaja and Cosmit Reservation,
California
Ione Band of Miwok Indians of
California
Iowa Tribe of Kansas and Nebraska
Iowa Tribe of Oklahoma
Jackson Rancheria of Me-Wuk Indians of
California
Jamestown S'Klallam Tribe of
Washington
Jamul Indian Village of California
Jena Band of Choctaw Indians,
Louisiana
Jicarilla Apache Nation, New Mexico
Kaibab Band of Paiute Indians of the
Kaibab Indian Reservation, Arizona
Kalispel Indian Community of the
Kalispel Reservation, Washington
Karuk Tribe of California
Kashia Band of Pomo Indians of the
Stewarts Point Rancheria, California
Kaw Nation, Oklahoma
Keweenaw Bay Indian Community,
Michigan

Kialegee Tribal Town, Oklahoma
Kickapoo Tribe of Indians of the
Kickapoo Reservation in Kansas
Kickapoo Tribe of Oklahoma
Kickapoo Traditional Tribe of Texas
Kiowa Indian Tribe of Oklahoma
Klamath Tribes, Oregon
Kootenai Tribe of Idaho
La Jolla Band of Luiseno Mission
Indians of the La Jolla Reservation,
California
La Posta Band of Diegueno Mission
Indians of the La Posta Indian
Reservation, California
Lac Courte Oreilles Band of Lake
Superior Chippewa Indians of
Wisconsin
Lac du Flambeau Band of Lake Superior
Chippewa Indians of the Lac du
Flambeau Reservation of Wisconsin
Lac Vieux Desert Band of Lake Superior
Chippewa Indians, Michigan
Las Vegas Tribe of Paiute Indians of the
Las Vegas Indian Colony, Nevada
Little River Band of Ottawa Indians,
Michigan
Little Traverse Bay Bands of Odawa
Indians, Michigan
Lower Lake Rancheria, California
Los Coyotes Band of Cahuilla and
Cupeno Indians, California (formerly
the Los Coyotes Band of Cahuilla &
Cupeno Indians of the Los Coyotes
Reservation)
Lovelock Paiute Tribe of the Lovelock
Indian Colony, Nevada
Lower Brule Sioux Tribe of the Lower
Brule Reservation, South Dakota
Lower Elwha Tribal Community of the
Lower Elwha Reservation,
Washington
Lower Sioux Indian Community in the
State of Minnesota
Lummi Tribe of the Lummi Reservation,
Washington
Lytton Rancheria of California
Makah Indian Tribe of the Makah Indian
Reservation, Washington
Manchester Band of Pomo Indians of the
Manchester-Point Arena Rancheria,
California
Manzanita Band of Diegueno Mission
Indians of the Manzanita Reservation,
California
Mashantucket Pequot Tribe of
Connecticut
Mashpee Wampanoag Tribe,
Massachusetts
Match-e-be-nash-she-wish Band of
Pottawatomi Indians of Michigan
Mechoopda Indian Tribe of Chico
Rancheria, California
Menominee Indian Tribe of Wisconsin
Mesa Grande Band of Diegueno Mission
Indians of the Mesa Grande
Reservation, California
Mescalero Apache Tribe of the
Mescalero Reservation, New Mexico
Miami Tribe of Oklahoma

Miccosukee Tribe of Indians of Florida
Middletown Rancheria of Pomo Indians
of California
Minnesota Chippewa Tribe, Minnesota
(Six component reservations: Bois
Forte Band (Nett Lake); Fond du Lac
Band; Grand Portage Band; Leech
Lake Band; Mille Lacs Band; White
Earth Band)
Mississippi Band of Choctaw Indians,
Mississippi
Moapa Band of Paiute Indians of the
Moapa River Indian Reservation,
Nevada
Modoc Tribe of Oklahoma
Mohegan Indian Tribe of Connecticut
Mooretown Rancheria of Maidu Indians
of California
Morongo Band of Mission Indians,
California (formerly the Morongo
Band of Cahuilla Mission Indians of
the Morongo Reservation)
Muckleshoot Indian Tribe of the
Muckleshoot Reservation, Washington
Muscogee (Creek) Nation, Oklahoma
Narragansett Indian Tribe of Rhode
Island
Navajo Nation, Arizona, New Mexico &
Utah
Nez Perce Tribe, Idaho (previously
listed as Nez Perce Tribe of Idaho)
Nisqually Indian Tribe of the Nisqually
Reservation, Washington
Nooksack Indian Tribe of Washington
Northern Cheyenne Tribe of the
Northern Cheyenne Indian
Reservation, Montana
Northfork Rancheria of Mono Indians of
California
Northwestern Band of Shoshoni Nation
of Utah (Washakie)
Nottawaseppi Huron Band of the
Potawatomi, Michigan (formerly the
Huron Potawatomi, Inc.)
Oglala Sioux Tribe of the Pine Ridge
Reservation, South Dakota
Ohkay Owingeh, New Mexico (formerly
the Pueblo of San Juan)
Omaha Tribe of Nebraska
Oneida Nation of New York
Oneida Tribe of Indians of Wisconsin
Onondaga Nation of New York
Osage Nation, Oklahoma (formerly the
Osage Tribe)
Ottawa Tribe of Oklahoma
Otoe-Missouria Tribe of Indians,
Oklahoma
Paiute Indian Tribe of Utah (Cedar Band
of Paiutes, Kanosh Band of Paiutes,
Koosharem Band of Paiutes, Indian
Peaks Band of Paiutes, and Shivwits
Band of Paiutes) (formerly Paiute
Indian Tribe of Utah (Cedar City Band
of Paiutes, Kanosh Band of Paiutes,
Koosharem Band of Paiutes, Indian
Peaks Band of Paiutes, and Shivwits
Band of Paiutes))
Paiute-Shoshone Indians of the Bishop
Community of the Bishop Colony,
California

Paiute-Shoshone Tribe of the Fallon
Reservation and Colony, Nevada
Paiute-Shoshone Indians of the Lone
Pine Community of the Lone Pine
Reservation, California
Pala Band of Luiseno Mission Indians of
the Pala Reservation, California
Pascua Yaqui Tribe of Arizona
Paskenta Band of Nomlaki Indians of
California
Passamaquoddy Tribe of Maine
Pauma Band of Luiseno Mission Indians
of the Pauma & Yuima Reservation,
California
Pawnee Nation of Oklahoma
Pechanga Band of Luiseno Mission
Indians of the Pechanga Reservation,
California
Penobscot Tribe of Maine
Peoria Tribe of Indians of Oklahoma
Picayune Rancheria of Chukchansi
Indians of California
Pinoleville Pomo Nation, California
(formerly the Pinoleville Rancheria of
Pomo Indians of California)
Pit River Tribe, California (includes XL
Ranch, Big Bend, Likely, Lookout,
Montgomery Creek and Roaring Creek
Rancherias)
Poarch Band of Creek Indians of
Alabama
Pokagon Band of Potawatomi Indians,
Michigan and Indiana
Ponca Tribe of Indians of Oklahoma
Ponca Tribe of Nebraska
Port Gamble Indian Community of the
Port Gamble Reservation, Washington
Potter Valley Tribe, California
Prairie Band of Potawatomi Nation,
Kansas
Prairie Island Indian Community in the
State of Minnesota
Pueblo of Acoma, New Mexico
Pueblo of Cochiti, New Mexico
Pueblo of Jemez, New Mexico
Pueblo of Isleta, New Mexico
Pueblo of Laguna, New Mexico
Pueblo of Nambe, New Mexico
Pueblo of Picuris, New Mexico
Pueblo of Pojoaque, New Mexico
Pueblo of San Felipe, New Mexico
Pueblo of San Ildefonso, New Mexico
Pueblo of Sandia, New Mexico
Pueblo of Santa Ana, New Mexico
Pueblo of Santa Clara, New Mexico
Pueblo of Santo Domingo, New Mexico
Pueblo of Taos, New Mexico
Pueblo of Tesuque, New Mexico
Pueblo of Zia, New Mexico
Puyallup Tribe of the Puyallup
Reservation, Washington
Pyramid Lake Paiute Tribe of the
Pyramid Lake Reservation, Nevada
Quapaw Tribe of Indians, Oklahoma
Quartz Valley Indian Community of the
Quartz Valley Reservation of
California
Quechan Tribe of the Fort Yuma Indian
Reservation, California & Arizona

Quileute Tribe of the Quileute
Reservation, Washington
Quinault Tribe of the Quinault
Reservation, Washington
Ramona Band or Village of Cahuilla
Mission Indians of California
Red Cliff Band of Lake Superior
Chippewa Indians of Wisconsin
Red Lake Band of Chippewa Indians,
Minnesota
Redding Rancheria, California
Redwood Valley Rancheria of Pomo
Indians of California
Reno-Sparks Indian Colony, Nevada
Resighini Rancheria, California
Rincon Band of Luiseno Mission
Indians of the Rincon Reservation,
California
Robinson Rancheria of Pomo Indians of
California
Rosebud Sioux Tribe of the Rosebud
Indian Reservation, South Dakota
Round Valley Indian Tribes of the
Round Valley Reservation, California
Rumsey Indian Rancheria of Wintun
Indians of California
Sac & Fox Tribe of the Mississippi in
Iowa
Sac & Fox Nation of Missouri in Kansas
and Nebraska
Sac & Fox Nation, Oklahoma
Saginaw Chippewa Indian Tribe of
Michigan
St. Croix Chippewa Indians of
Wisconsin
Saint Regis Mohawk Tribe, New York
(formerly the St. Regis Band of
Mohawk Indians of New York)
Salt River Pima-Maricopa Indian
Community of the Salt River
Reservation, Arizona
Samish Indian Nation, Washington
San Carlos Apache Tribe of the San
Carlos Reservation, Arizona
San Juan Southern Paiute Tribe of
Arizona
San Manuel Band of Mission Indians,
California (previously listed as the
San Manual Band of Serrano Mission
Indians of the San Manual
Reservation)
San Pasqual Band of Diegueno Mission
Indians of California
Santa Rosa Indian Community of the
Santa Rosa Rancheria, California
Santa Rosa Band of Cahuilla Indians,
California (formerly the Santa Rosa
Band of Cahuilla Mission Indians of
the Santa Rosa Reservation)
Santa Ynez Band of Chumash Mission
Indians of the Santa Ynez
Reservation, California
Santee Sioux Nation, Nebraska
Sauk-Suiattle Indian Tribe of
Washington
Sault Ste. Marie Tribe of Chippewa
Indians of Michigan
Scotts Valley Band of Pomo Indians of
California

Seminole Nation of Oklahoma
Seminole Tribe of Florida (Dania, Big
Cypress, Brighton, Hollywood &
Tampa Reservations)
Seneca Nation of New York
Seneca-Cayuga Tribe of Oklahoma
Shakopee Mdewakanton Sioux
Community of Minnesota
Shawnee Tribe, Oklahoma
Sherwood Valley Rancheria of Pomo
Indians of California
Shingle Springs Band of Miwok Indians,
Shingle Springs Rancheria (Verona
Tract), California
Shoalwater Bay Tribe of the Shoalwater
Bay Indian Reservation, Washington
Shoshone Tribe of the Wind River
Reservation, Wyoming
Shoshone-Bannock Tribes of the Fort
Hall Reservation of Idaho
Shoshone-Paiute Tribes of the Duck
Valley Reservation, Nevada
Sisseton-Wahpeton Oyate of the Lake
Traverse Reservation, South Dakota
Skokomish Indian Tribe of the
Skokomish Reservation, Washington
Skull Valley Band of Goshute Indians of
Utah
Smith River Rancheria, California
Snoqualmie Tribe, Washington
Soboba Band of Luiseno Indians,
California
Sokaogon Chippewa Community,
Wisconsin
Southern Ute Indian Tribe of the
Southern Ute Reservation, Colorado
Spirit Lake Tribe, North Dakota
Spokane Tribe of the Spokane
Reservation, Washington
Squaxin Island Tribe of the Squaxin
Island Reservation, Washington
Standing Rock Sioux Tribe of North &
South Dakota
Stockbridge Munsee Community,
Wisconsin
Stillaguamish Tribe of Washington
Summit Lake Paiute Tribe of Nevada
Suquamish Indian Tribe of the Port
Madison Reservation, Washington
Susanville Indian Rancheria, California
Swinomish Indians of the Swinomish
Reservation, Washington
Sycuan Band of the Kumeyaay Nation
Table Mountain Rancheria of California
Te-Moak Tribe of Western Shoshone
Indians of Nevada (Four constituent
bands: Battle Mountain Band; Elko
Band; South Fork Band and Wells
Band)
Thlopthlocco Tribal Town, Oklahoma
Three Affiliated Tribes of the Fort
Berthold Reservation, North Dakota
Tohono O'odham Nation of Arizona
Tonawanda Band of Seneca Indians of
New York
Tonkawa Tribe of Indians of Oklahoma
Tonto Apache Tribe of Arizona
Torres Martinez Desert Cahuilla Indians,
California (formerly the Torres-

Martinez Band of Cahuilla Mission Indians of California
Tule River Indian Tribe of the Tule River Reservation, California
Tulalip Tribes of the Tulalip Reservation, Washington
Tunica-Biloxi Indian Tribe of Louisiana
Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California
Turtle Mountain Band of Chippewa Indians of North Dakota
Tuscarora Nation of New York
Twenty-Nine Palms Band of Mission Indians of California
United Auburn Indian Community of the Auburn Rancheria of California
United Keetoowah Band of Cherokee Indians in Oklahoma
Upper Sioux Community, Minnesota
Upper Skagit Indian Tribe of Washington
Ute Indian Tribe of the Uintah & Ouray Reservation, Utah
Ute Mountain Tribe of the Ute Mountain Reservation, Colorado, New Mexico & Utah
Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California
Walker River Paiute Tribe of the Walker River Reservation, Nevada
Wampanoag Tribe of Gay Head (Aquinnah) of Massachusetts
Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches)
White Mountain Apache Tribe of the Fort Apache Reservation, Arizona
Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma
Wilton Rancheria, California
Winnebago Tribe of Nebraska
Winnemucca Indian Colony of Nevada
Wiyot Tribe, California (formerly the Table Bluff Reservation—Wiyot Tribe)
Wyandotte Nation, Oklahoma
Yankton Sioux Tribe of South Dakota
Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona
Yavapai-Prescott Tribe of the Yavapai Reservation, Arizona
Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada
Yomba Shoshone Tribe of the Yomba Reservation, Nevada
Ysleta Del Sur Pueblo of Texas
Yurok Tribe of the Yurok Reservation, California
Zuni Tribe of the Zuni Reservation, New Mexico

**Native Entities Within the State of Alaska Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs**

Native Village of Afognak
Agdaagux Tribe of King Cove
Native Village of Akhiok

Akiachak Native Community
Akiak Native Community
Native Village of Akutan
Village of Alakanuk
Alatna Village
Native Village of Aleknagik
Algaaciq Native Village (St. Mary's)
Allakaket Village
Native Village of Ambler
Village of Anaktuvuk Pass
Yupiit of Andreafski
Angoon Community Association
Village of Aniak
Anvik Village
Arctic Village (See Native Village of Venetie Tribal Government)
Asa'carsarmiut Tribe
Native Village of Atka
Village of Atmautluak
Atqasuk Village (Atkasook)
Native Village of Barrow Inupiat Traditional Government
Beaver Village
Native Village of Belkofski
Village of Bill Moore's Slough
Birch Creek Tribe
Native Village of Brevig Mission
Native Village of Buckland
Native Village of Cantwell
Native Village of Chenega (aka Chanega)
Chalkyitsik Village
Cheesh-Na Tribe (formerly the Native Village of Chistochina)
Village of Chefornak
Chevak Native Village
Chickaloon Native Village
Chignik Bay Tribal Council (formerly the Native Village of Chignik)
Native Village of Chignik Lagoon
Chignik Lake Village
Chilkat Indian Village (Klukwan)
Chilkoot Indian Association (Haines)
Chinik Eskimo Community (Golovin)
Native Village of Chitina
Native Village of Chuathbaluk (Russian Mission, Kuskokwim)
Chuloonawick Native Village
Circle Native Community
Village of Clarks Point
Native Village of Council
Craig Community Association
Village of Crooked Creek
Curyung Tribal Council
Native Village of Deering
Native Village of Diomede (aka Inalik)
Village of Dot Lake
Douglas Indian Association
Native Village of Eagle
Native Village of Eek
Egegik Village
Eklutna Native Village
Native Village of Ekuk
Ekwok Village
Native Village of Elim
Emmonak Village
Evansville Village (aka Bettles Field)
Native Village of Eyak (Cordova)
Native Village of False Pass
Native Village of Fort Yukon

Native Village of Gakona
Galena Village (aka Louden Village)
Native Village of Gambell
Native Village of Georgetown
Native Village of Goodnews Bay
Organized Village of Grayling (aka Holikachuk)
Gulkana Village
Native Village of Hamilton
Healy Lake Village
Holy Cross Village
Hoonah Indian Association
Native Village of Hooper Bay
Hughes Village
Huslia Village
Hydaburg Cooperative Association
Igiugig Village
Village of Iliamna
Inupiat Community of the Arctic Slope
Iqurmuit Traditional Council
Ivanoff Bay Village
Kaguyak Village
Organized Village of Kake
Kaktovik Village (aka Barter Island)
Village of Kalskag
Village of Kaltag
Native Village of Kanatak
Native Village of Karluk
Organized Village of Kasaan
Kasigluk Traditional Elders Council
Kenaitze Indian Tribe
Ketchikan Indian Corporation
Native Village of Kiana
King Island Native Community
King Salmon Tribe
Native Village of Kipnuk
Native Village of Kivalina
Klawock Cooperative Association
Native Village of Kluti Kaah (aka Copper Center)
Knik Tribe
Native Village of Kobuk
Kokhanok Village
Native Village of Kongiganak
Village of Kotlik
Native Village of Kotzebue
Native Village of Koyuk
Koyukuk Native Village
Organized Village of Kwethluk
Native Village of Kwigillingok
Native Village of Kwinhagak (aka Quinhagak)
Native Village of Larsen Bay
Levelock Village
Lesnoi Village (aka Woody Island)
Lime Village
Village of Lower Kalskag
Manley Hot Springs Village
Manokotak Village
Native Village of Marshall (aka Fortuna Ledge)
Native Village of Mary's Igloo
McGrath Native Village
Native Village of Mekoryuk
Mentasta Traditional Council
Metlakatla Indian Community, Annette Island Reserve
Native Village of Minto
Naknek Native Village

Native Village of Nanwalek (aka English Bay)
Native Village of Napaimute
Native Village of Napakiak
Native Village of Napaskiak
Native Village of Nelson Lagoon
Nenana Native Association
New Koliganek Village Council
New Stuyahok Village
Newhalen Village
Newtok Village
Native Village of Nightmute
Nikolai Village
Native Village of Nikolski
Ninilchik Village
Native Village of Noatak
Nome Eskimo Community
Nondalton Village
Noorvik Native Community
Northway Village
Native Village of Nuiqsut (aka Nooiksut)
Nulato Village
Nunakauyarmiut Tribe
Native Village of Nunam Iqua (formerly the Native Village of Sheldon's Point)
Native Village of Nunapitchuk
Village of Ohogamiut
Village of Old Harbor
Orutsararmuit Native Village (aka Bethel)
Oscarville Traditional Village
Native Village of Ouzinkie
Native Village of Paimiut
Pauloff Harbor Village
Pedro Bay Village
Native Village of Perryville
Petersburg Indian Association
Native Village of Pilot Point
Pilot Station Traditional Village
Native Village of Pitka's Point
Platinum Traditional Village
Native Village of Point Hope
Native Village of Point Lay
Native Village of Port Graham
Native Village of Port Heiden
Native Village of Port Lions
Portage Creek Village (aka Ohgsenakale)
Pribilof Islands Aleut Communities of St. Paul & St. George Islands
Qagan Tayagungin Tribe of Sand Point Village
Qawalangin Tribe of Unalaska
Rampart Village
Village of Red Devil
Native Village of Ruby
Saint George Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)

Native Village of Saint Michael
Saint Paul Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)
Village of Salamatoff
Native Village of Savoonga
Organized Village of Saxman
Native Village of Scammon Bay
Native Village of Selawik
Seldovia Village Tribe
Shageluk Native Village
Native Village of Shaktoolik
Native Village of Shishmaref
Native Village of Shungnak
Sitka Tribe of Alaska
Skagway Village
Village of Sleetmute
Village of Solomon
South Naknek Village
Stebbins Community Association
Native Village of Stevens
Village of Stony River
Sun'aq Tribe of Kodiak (formerly the Shoonaq' Tribe of Kodiak)
Takotna Village
Native Village of Tanacross
Native Village of Tanana
Native Village of Tatitlek
Native Village of Tazlina
Telida Village
Native Village of Teller
Native Village of Tetlin
Central Council of the Tlingit & Haida Indian Tribes
Traditional Village of Togiak
Tuluksak Native Community
Native Village of Tuntutuliak
Native Village of Tununak
Twin Hills Village
Native Village of Tyonek
Ugashik Village
Umkumiute Native Village
Native Village of Unalakleet
Native Village of Unga
Village of Venetie (See Native Village of Venetie Tribal Government)
Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie)
Village of Wainwright
Native Village of Wales
Native Village of White Mountain
Wrangell Cooperative Association
Yakutat Tlingit Tribe

[FR Doc. E9–19124 Filed 8–10–09; 8:45 am]
BILLING CODE 4310–4J–P

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

[FWS-R9-IA-2009-N142; 96300-1671-0000-P5]

### Issuance of Permits

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of issuance of permits.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), have issued the following permits to conduct certain activities with endangered species and/or marine mammals.

**ADDRESSES:** Documents and other information submitted with these applications are available for review, subject to the requirements of the Privacy Act and Freedom of Information Act, by any party who submits a written request for a copy of such documents to: U.S. Fish and Wildlife Service, Division of Management Authority, 4401 North Fairfax Drive, Room 212, Arlington, Virginia 22203; fax 703/358-2281.

**FOR FURTHER INFORMATION CONTACT:** Division of Management Authority, telephone 703/358-2104.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that on the dates below, as authorized by the provisions of the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*), and/or the Marine Mammal Protection Act of 1972, as amended (16 U.S.C. 1361 *et seq.*), the Fish and Wildlife Service issued the requested permits subject to certain conditions set forth therein. For each permit for an endangered species, the Service found that (1) the application was filed in good faith, (2) the granted permit would not operate to the disadvantage of the endangered species, and (3) the granted permit would be consistent with the purposes and policy set forth in Section 2 of the Endangered Species Act of 1973, as amended.

TABLE: ENDANGERED SPECIES

| Permit number | Applicant | Receipt of application FED-ERAL REGISTER notice | Permit issuance date |
|---|---|---|---|
| 011646 .................... | Kootenai Tribe of Idaho ........................................ | 74 FR 21816; May 11, 2009 .. | July 30, 2009 |
| 062075, 064075, 068236, 068237, 068238, 068349, 088955, 088956, 088957, 088958, 088959, 088960, 119894, 120319, 213635, 213636, and 213637. | Hawthorn Corporation ........................................ | 74 FR 21817; May 11, 2009 .. | June 30, 2009 |

# EXHIBIT B



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

MAR 05 2000

The Honorable Paul Del Rosa
Chairman
Alturas Indian Rancheria
P.O. Box 340
Alturas, California 96101

Dear Chairman Del Rosa:

On March 23, 2000, we received the Tribal-State Compact between the State of California (State) and Alturas Indian Rancheria (Tribe), dated October 5, 1999. We have completed our review of this Compact and conclude that it does not violate the Indian Gaming Regulatory Act of 1988 (IGRA), Federal law, or our trust responsibility. Therefore, pursuant to delegated authority and Section 11 of IGRA, we approve the Compact. The Compact shall take effect when the notice of our approval, pursuant to Section 11 (d)(3)(B) of IGRA, 25 U.S.C. § 2710(d)(3)(B), is published in the FEDERAL REGISTER.

Paragraph C of the preamble to the Compact provides that gaming will be located on the Tribe's "reservation land, which is located in Modoc County of California." The terms of this Compact are approved only to the extent that they authorize gaming on "Indian Lands" as defined in IGRA, now or hereafter acquired by the Tribe, and provided that gaming on such lands complies with all other applicable provisions of IGRA.

Section 11(d)(1) of IGRA, 25 U.S.C. § 2710(d)(1), permits Class III gaming activities on Indian lands if the activities are "located in a State that permits such gaming for any purpose by any person, organization, or entity." If Class III gaming activities are permitted for any Indian tribe in the State, those activities come within the plain meaning of IGRA as activities permitted "by any person, organization, or entity."

As you know, on March 7, Californians amended their state's constitution to permit the Governor to compact with Indian tribes, subject to ratification by the State Legislature. The compacts authorized by the constitutional amendment would permit slot machines, lottery games, and banking and percentage card games to be conducted on tribal lands. The Governor had previously signed and the Legislature had approved this compact which gives the Tribe, along with other California Indian tribes, the exclusive right to conduct Class III gaming as authorized by the State's constitutional amendment.

The Governor can, consistent with the State's amended Constitution, conclude a compact giving an Indian tribe, along with other California Indian tribes, the exclusive right to conduct certain types of Class III gaming. This exercise of state authority in no way violates the equal protection provisions of the United States Constitution. As the Supreme Court has noted:

> On numerous occasions this Court specifically has upheld legislation that singles out Indians for particular and special treatment... This unique legal status is of long standing...and its sources are diverse... As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed. (Citations omitted.)

*Morton v. Mancari*, 417 U.S. 535, 555-56 (1974); *see also*, Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 500-501 (1979) (state statute in response to a federal measure did not violate Equal Protection Clause of the Fourteenth Amendment); *cf.*, *Rice v. Cayetano*, ___U.S.___, 120 S.Ct. 1044 (2000) (while finding that a state scheme limiting voting to Hawaiians of a particular ancestry violated the Fifteenth Amendment, the Court nevertheless reaffirmed the validity of special legislation for Indians).

The IGRA is unique legislation. It was enacted in the wake of the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which concluded that California had no civil, regulatory authority over gaming on Indian lands. The IGRA represents a comprehensive, preemptive legislative judgment by the Congress of the United States in the exercise of its plenary power over Indians to reconcile the interests of the tribes, the states and the Federal government. The compact provision which gives the Tribe, along with other tribes in the State, the exclusive right to conduct limited forms of Class III gaming on Indian lands, is consistent with the IGRA, within the scope of plenary power of Congress over Indian affairs, and does not violate the United States Constitution.

Please note that Minimum Internal Control Standards must be in accordance with the National Indian Gaming Commission's (NIGC) regulations, set forth in 25 CFR Part 542.

Notwithstanding our approval of the Compacts, Section 11(d)(1) of IGRA, 25 U.S.C. § 2710(d)(1), requires that tribal gaming ordinances be approved by the Chairman of the NIGC. Regulations governing approval of Class II and Class III gaming ordinances are found in 25 CFR §§ 501.1-577.15 (1999). Pursuant to IGRA and the regulations, even previously existing gaming ordinances must be submitted to the NIGC for approval when requested by the Chairman. The Tribe may want to contact the NIGC at (202) 632-7003 for further information to determine when and how to submit the ordinance for approval by the NIGC.

If the Tribe enters into a management contract for the operation and management of the Tribe's gaming facility, the contract must likewise be submitted to, and approved by the Chairman of the NIGC pursuant to Section 11(d)(9) of IGRA, 25 U.S.C. § 2710(d)(9) and the NIGC's regulations governing management contracts. The Tribe may want to contact the NIGC for information on submitting the management contract for approval by the NIGC.

In addition, we note that the Compact includes a reference to the sale of alcoholic beverages. The possession or sale of liquor in Indian Country is a violation of Federal criminal laws (18 U.S.C. § 1154) unless it is done in accordance with an ordinance certified by the Secretary and published in the FEDERAL REGISTER (18 U.S.C. § 1161). If the Tribe does not have a certified liquor ordinance, Secretarial certification of such an ordinance must be obtained and published prior to the selling of liquor in Indian Country. The Tribe may want to contact the Pacific Region for assistance and information on the requirements for certification of the ordinance.

We wish the Tribe and the State success in their economic venture.

Sincerely,

Assistant Secretary - Indian Affairs

Enclosure

# TRIBAL-STATE COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND THE

# ALTURAS RANCHERIA

## TABLE OF CONTENTS

PREAMBLE                                                                1

SECTION 1.0
    PURPOSES AND OBJECTIVES                                        2

SECTION 2.0
    DEFINITIONS                                                    3

SECTION 3.0
    CLASS III GAMING AUTHORIZED AND PERMITTED                      5

SECTION 4.0
    SCOPE OF CLASS III GAMING                                      5

SECTION 5.0
    REVENUE DISTRIBUTION                                           9

SECTION 6.0
    LICENSING                                                     11

SECTION 7.0
    COMPLIANCE ENFORCEMENT                                        21

SECTION 8.0
    RULES AND REGULATIONS FOR THE OPERATION AND
    MANAGEMENT OF THE TRIBAL GAMING OPERATION                      23

SECTION 9.0
    DISPUTE RESOLUTION PROVISIONS                                 27

SECTION 10.0
    PUBLIC AND WORKPLACE HEALTH, SAEFTEY
    AND LIABILITY                                                 29

SECTION 11.0
    EFFECTIVE DATE AND TERM OF COMPACT                            34

i

SECTION 12.0
    AMENDMENTS; RENEGOTIATIONS              35

SECTION 13.0
    NOTICES                  37

SECTION 14.0
    CHANGES IN IGRA              37

SECTION 15.0
    MISCELLANEOUS              37

ATTACHMENTS:
ADDENDUM A
ADDENDUM B
NOTICE OF ADOPTION OF MODEL TRIBAL LABOR RELATIONS ORDINANCE
MODEL TRIBAL LABOR RELATIONS ORDINANCE

## TRIBAL-STATE GAMING COMPACT
Between the ALTURAS RANCHERIA, a federally recognized Indian Tribe,
and the
## STATE OF CALIFORNIA

This Tribal-State Gaming Compact is entered into on a government-to-government basis by and between the Alturas Rancheria, a federally-recognized sovereign Indian tribe (hereafter "Tribe"), and the State of California, a sovereign State of the United States (hereafter "State"), pursuant to the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, codified at 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) (hereafter "IGRA"), and any successor statute or amendments.

### PREAMBLE

A.   In 1988, Congress enacted IGRA as the federal statute governing Indian gaming in the United States. The purposes of IGRA are to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; to provide a statutory basis for regulation of Indian gaming adequate to shield it from organized crime and other corrupting influences; to ensure that the Indian tribe is the primary beneficiary of the gaming operation; to ensure that gaming is conducted fairly and honestly by both the operator and players; and to declare that the establishment of an independent federal regulatory authority for gaming on Indian lands, federal standards for gaming on Indian lands, and a National Indian Gaming Commission are necessary to meet congressional concerns.

B.   The system of regulation of Indian gaming fashioned by Congress in IGRA rests on an allocation of regulatory jurisdiction among the three sovereigns involved: the federal government, the state in which a tribe has land, and the tribe itself. IGRA makes Class III gaming activities lawful on the lands of federally-recognized Indian tribes only if such activities are:   (1) authorized by a tribal ordinance, (2) located in a state that permits such gaming for any purpose by any person, organization or entity, and (3) conducted in conformity with a gaming compact entered into between the Indian tribe and the state and approved by the Secretary of the Interior.

C.   The Tribe does not currently operate a gaming facility that offers Class III gaming activities. However, on or after the effective date of this Compact, the

1

Tribe intends to develop and operate a gaming facility offering Class III gaming activities on its reservation land, which is located in Modoc County of California.

D.    The State enters into this Compact out of respect for the sovereignty of the Tribe; in recognition of the historical fact that Indian gaming has become the single largest revenue-producing activity for Indian tribes in the United States; out of a desire to terminate pending "bad faith" litigation between the Tribe and the State; to initiate a new era of tribal-state cooperation in areas of mutual concern; out of a respect for the sentiment of the voters of California who, in approving Proposition 5, expressed their belief that the forms of gaming authorized herein should be allowed; and in anticipation of voter approval of SCA 11 as passed by the California legislature.

E.    The exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California. The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues. In consideration for the exclusive rights enjoyed by the tribes, and in further consideration for the State's willingness to enter into this Compact, the tribes have agreed to provide to the State, on a sovereign-to-sovereign basis, a portion of its revenue from Gaming Devices.

F.    The State has a legitimate interest in promoting the purposes of IGRA for all federally-recognized Indian tribes in California, whether gaming or non-gaming. The State contends that it has an equally legitimate sovereign interest in regulating the growth of Class III gaming activities in California. The Tribe and the State share a joint sovereign interest in ensuring that tribal gaming activities are free from criminal and other undesirable elements.

Section 1.0. PURPOSES AND OBJECTIVES.

The terms of this Gaming Compact are designed and intended to:

(a) Evidence the goodwill and cooperation of the Tribe and State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

(b) Develop and implement a means of regulating Class III gaming, and only Class III gaming, on the Tribe's Indian lands to ensure its fair and honest operation in accordance with IGRA, and through that regulated Class III gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs.

(c) Promote ethical practices in conjunction with that gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Tribe's Gaming Operation and protecting against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming.

Sec. 2.0. DEFINITIONS.

Sec. 2.1. "Applicant" means an individual or entity that applies for a Tribal license or State certification.

Sec. 2.2. "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two representatives from each tribal gaming agency of those tribes with whom the State has a gaming compact under IGRA, and up to two delegates each from the state Division of Gambling Control and the state Gambling Control Commission.

Sec. 2.3. "Class III gaming" means the forms of Class III gaming defined as such in 25 U.S.C. Sec. 2703(8) and by regulations of the National Indian Gaming Commission.

Sec. 2.4. "Gaming Activities" means the Class III gaming activities authorized under this Gaming Compact.

Sec. 2.5. "Gaming Compact" or "Compact" means this compact.

Sec. 2.6. "Gaming Device" means a slot machine, including an electronic, electromechanical, electrical, or video device that, for consideration, permits: individual play with or against that device or the participation in any electronic, electromechanical, electrical, or video system to which that device is connected; the playing of games thereon or therewith, including, but not limited to, the playing of facsimiles of games of chance or skill; the possible delivery of, or entitlement by the player to, a prize or something of value as a result of the application of an element of chance; and a method for viewing the outcome, prize won, and other information regarding the playing of games thereon or therewith.

Sec. 2.7. "Gaming Employee" means any person who (a) operates, maintains, repairs, assists in any Class III gaming activity, or is in any way responsible for

3

supervising such gaming activities or persons who conduct, operate, account for, or supervise any such gaming activity, (b) is in a category under federal or tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Agency with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public.

Sec. 2.8. "Gaming Facility" or "Facility" means any building in which Class III gaming activities or gaming operations occur, or in which the business records, receipts, or other funds of the gaming operation are maintained (but excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of Class II gaming (as defined under IGRA) therein.

Sec. 2.9. "Gaming Operation" means the business enterprise that offers and operates Class III Gaming Activities, whether exclusively or otherwise.

Sec. 2.10. "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Class III Gaming Activities on the Tribe's Indian lands and approved under IGRA.

Sec. 2.11. "Gaming Resources" means any goods or services provided or used in connection with Class III Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, gambling devices and ancillary equipment, implements of gaming activities such as playing cards and dice, furniture designed primarily for Class III gaming activities, maintenance or security equipment and services, and Class III gaming consulting services. "Gaming Resources" does not include professional accounting and legal services.

Sec. 2.12. "Gaming Resource Supplier" means any person or entity who, directly or indirectly, manufactures, distributes, supplies, vends, leases, or otherwise purveys Gaming Resources to the Gaming Operation or Gaming Facility, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if the purveyor is not otherwise a Gaming Resource Supplier as described by of Section 6.4.5, the compensation received by the purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gambling Operation.

4

Sec. 2.13. "IGRA" means the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) any amendments thereto, and all regulations promulgated thereunder.

Sec. 2.14. "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

Sec. 2.15. "Net Win" means "net win" as defined by American Institute of Certified Public Accountants.

Sec. 2.16. "NIGC" means the National Indian Gaming Commission.

Sec. 2.17. "State" means the State of California or an authorized official or agency thereof.

Sec. 2.18. "State Gaming Agency" means the entities authorized to investigate, approve, and regulate gaming licenses pursuant to the Gambling Control Act (Chapter 5 (commencing with Section 19800) of Division 8 of the Business and Professions Code).

Sec. 2.19. "Tribal Chairperson" means the person duly elected or selected under the Tribe's organic documents, customs, or traditions to serve as the primary spokesperson for the Tribe.

Sec. 2.20. "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the National Indian Gaming Commission, as primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribal Gaming Ordinance. No person employed in, or in connection with, the management, supervision, or conduct of any gaming activity may be a member or employee of the Tribal Gaming Agency.

Sec. 2.21. "Tribe" means the Alturas Rancheria, a federally-recognized Indian tribe, or an authorized official or agency thereof.

Sec. 3.0 CLASS III GAMING AUTHORIZED AND PERMITTED. The Tribe is hereby authorized and permitted to engage in only the Class III Gaming Activities expressly referred to in Section 4.0 and shall not engage in Class III gaming that is not expressly authorized in that Section.

Sec. 4.0. SCOPE OF CLASS III GAMING.

Sec. 4.1. Authorized and Permitted Class III gaming. The Tribe is hereby authorized and permitted to operate the following Gaming Activities under the terms and conditions set forth in this Gaming Compact:

(a) The operation of Gaming Devices.

(b) Any banking or percentage card game.

(c) The operation of any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law.

(e) Nothing herein shall be construed to preclude negotiation of a separate compact governing the conduct of off-track wagering at the Tribe's Gaming Facility.

Sec. 4.2. Authorized Gaming Facilities. The Tribe may establish and operate not more than two Gaming Facilities, and only on those Indian lands on which gaming may lawfully be conducted under the Indian Gaming Regulatory Act. The Tribe may combine and operate in each Gaming Facility any forms and kinds of gaming permitted under law, except to the extent limited under IGRA, this Compact, or the Tribe's Gaming Ordinance.

Sec. 4.3.      Sec. 4.3. Authorized number of Gaming Devices

Sec. 4.3.1 The Tribe may operate no more Gaming Devices than the larger of the following:

(a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or

(b) Three hundred fifty (350) Gaming Devices.

Sec. 4.3.2. Revenue Sharing with Non-Gaming Tribes.

(a)  For the purposes of this Section 4.3.2 and Section 5.0, the following definitions apply:

(i) A "Compact Tribe" is a tribe having a compact with the State that authorizes the Gaming Activities authorized by this Compact. Federally-recognized tribes that are operating fewer than 350 Gaming Devices are "Non-Compact Tribes." Non-Compact Tribes shall be deemed third party beneficiaries of this and other compacts identical in all material respects. A Compact Tribe that becomes a Non-Compact Tribe may not thereafter return to the status of a Compact Tribe for a period of two years becoming a Non-Compact Tribe.

(ii) The Revenue Sharing Trust Fund is a fund created by the Legislature and administered by the California Gambling Control Commission, as Trustee, for the receipt, deposit, and distribution of monies paid pursuant to this Section 4.3.2.

(iii) The Special Distribution Fund is a fund created by the Legislature for the receipt, deposit, and distribution of monies paid pursuant to Section 5.0.

Sec. 4.3.2.1. Revenue Sharing Trust Fund.

6

.   (a) The Tribe agrees with all other Compact Tribes that are parties to compacts having this Section 4.3.2, that each Non-Compact Tribe in the State shall receive the sum of $1.1 million per year. In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay $1.1 million per year to each Non-Compact Tribe, any available monies in that Fund shall be distributed to Non-Compact Tribes in equal shares. Monies in excess of the amount necessary to $1.1 million to each Non-Compact Tribe shall remain in the Revenue Sharing Trust Fund available for disbursement in future years.

(b) Payments made to Non-Compact Tribes shall be made quarterly and in equal shares out of the Revenue Sharing Trust Fund. The Commission shall serve as the trustee of the fund. The Commission shall have no discretion with respect to the use or disbursement of the trust funds. Its sole authority shall be to serve as a depository of the trust funds and to disburse them on a quarterly basis to Non-Compact Tribes. In no event shall the State's General Fund be obligated to make up any shortfall or pay any unpaid claims.

Sec. 4.3.2.2.  Allocation of Licenses.

(a) The Tribe, along with all other Compact Tribes, may acquire licenses to use Gaming Devices in excess of the number they are authorized to use under Sec. 4.3.1, but in no event may the Tribe operate more than 2,000 Gaming Devices, on the following terms, conditions, and priorities:

(1).  The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

(2) The Tribe may acquire and maintain a license to operate a Gaming Device by paying into the Revenue Sharing Trust Fund, on a quarterly basis, in the following amounts:

7

| Number of Licensed Devices | Fee Per Device Per Annum |
| --- | --- |
| 1-350 | $0 |
| 351-750 | $900 |
| 751-1250 | $1950 |
| 1251-2000 | $4350 |

(3) Licenses to use Gaming Devices shall be awarded as follows:

(i)  First, Compact Tribes with no Existing Devices (i.e., the number of Gaming Devices operated by a Compact Tribe as of September 1, 1999) may draw up to 150 licenses for a total of 500 Gaming Devices;

(ii) Next, Compact Tribes authorized under Section 4.3.1 to operate up to and including 500 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (i)), may draw up to an additional 500 licenses, to a total of 1000 Gaming Devices;

(iii) Next, Compact Tribes operating between 501 and 1000 Gaming Devices as of September 1, 1999 (including tribes, if any, that have acquired licenses through subparagraph (ii)), shall be entitled to draw up to an additional 750 Gaming Devices;

(iv) Next, Compact Tribes authorized to operate up to and including 1500 gaming devices  (including tribes, if any, that have acquired licenses through subparagraph (iii)), shall be entitled to draw up to an additional 500 licenses, for a total authorization to operate up to 2000 gaming devices.

(v) Next, Compact Tribes authorized to operate more than 1500 gaming devices (including tribes, if any, that have acquired licenses through subparagraph (iv))., shall be entitled to draw additional licenses up to a total authorization to operate up to 2000 gaming devices.

(vi). After the first round of draws, a second and subsequent round(s) shall be conducted utilizing the same order of priority as set forth above.  Rounds shall continue until tribes cease making draws, at which time draws will be discontinued for one month or until the Trustee is notified that a tribe desires to acquire a license, whichever last occurs.

8

(e) As a condition of acquiring licenses to operate Gaming Devices, a non-refundable one-time pre-payment fee shall be required in the amount of $1,250 per Gaming Device being licensed, which fees shall be deposited in the Revenue Sharing Trust Fund. The license for any Gaming Device shall be canceled if the Gaming Device authorized by the license is not in commercial operation within twelve months of issuance of the license.

Sec. 4.3.2.3. The Tribe shall not conduct any Gaming Activity authorized by this Compact if the Tribe is more than two quarterly contributions in arrears in its license fee payments to the Revenue Sharing Trust Fund.

Sec. 4.3.3.   If requested to do so by either party after March 7, 2003, but not later than March 31, 2003, the parties will promptly commence negotiations in good faith with the Tribe concerning any matters encompassed by Sections 4.3.1 and Section 4.3.2, and their subsections.

SEC. 5.0 REVENUE DISTRIBUTION

Sec. 5.1.  (a) The Tribe shall make contributions to the Special Distribution Fund created by the Legislature, in accordance with the following schedule, but only with respect to the number of Gaming Devices operated by the Tribe on September 1, 1999:

| Number of Terminals in Quarterly Device Base | Percent of Average Gaming Device Net Win |
|---|---|
| 1 - 200 | 0% |
| 201 – 500 | 7% |
| 501 – 1000 | 7% applied to the excess over 200 terminals, up to 500 terminals, plus 10% applied to terminals over 500 terminals, up to 1000 terminals. |
| 1000+ | 7% applied to excess over 200, up to 500 terminals, plus 10% applied to terminals over 500, up to 1000 terminals, plus 13% applied to the excess above 1000 terminals. |

9

(b) The first transfer to the Special Distribution Fund of its share of the gaming revenue shall made at the conclusion of the first calendar quarter following the second anniversary date of the effective date of this Compact.

Sec. 5.2. Use of funds. The State's share of the Gaming Device revenue shall be placed in the Special Distribution Fund, available for appropriation by the Legislature for the following purposes: (a) grants, including any administrative costs, for programs designed to address gambling addiction; (b) grants, including any administrative costs, for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the Compact; (d) payment of shortfalls that may occur in the Revenue Sharing Trust Fund; and (e) any other purposes specified by the Legislature. It is the intent of the parties that Compact Tribes will be consulted in the process of identifying purposes for grants made to local governments.

Sec. 5.3.  (a) The quarterly contributions due under Section 5.1 shall be determined and made not later than the thirtieth (30th) day following the end of each calendar quarter by first determining the total number of all Gaming Devices operated by a Tribe during a given quarter ("Quarterly Device Base"). The "Average Device Net Win" is calculated by dividing the total Net Win from all terminals during the quarter by the Quarterly Terminal Base.

(b)  Any quarterly contribution not paid on or before the date on which such amount is due shall be deemed overdue. If any quarterly contribution under Section 5.1 is overdue to the Special Distribution Fund, the Tribe shall pay to the Special Distribution Fund, in addition to the overdue quarterly contribution, interest on such amount from the date the quarterly contribution was due until the date such quarterly contribution (together with interest thereon) was actually paid at the rate of 1.0% per month or the maximum rate permitted by state law, whichever is less. Entitlement to such interest shall be in addition to any other remedies the State may have.

(c) At the time each quarterly contribution is made, the Tribe shall submit to the State a report (the "Quarterly Contribution Report") certified by an authorized representative of the Tribe reflecting the Quarterly Device Base, the Net Win from all terminals in the Quarterly Device Base (broken down by Gaming Device), and the Average Device Net Win.

(d) If the State causes an audit to be made pursuant to subdivision (c), and the Average Device Net Win for any quarter as reflected on such quarter's Quarterly Contribution Reports is found to be understated, the State will promptly notify the Tribe, and the Tribe will either accept the difference or provide a reconciliation

10

satisfactory to the State. If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State, the Tribe must immediately pay the amount of the resulting deficiencies in the quarterly contribution plus interest on such amounts from the date they were due at the rate of 1.0% per month or the maximum rate permitted by applicable law, whichever is less.

(e) The Tribe shall not conduct Class III gaming if more than two quarterly contributions to the Special Distribution Fund are overdue.

Sec. 6.0. LICENSING.

Sec. 6.1. Gaming Ordinance and Regulations. All Gaming Activities conducted under this Gaming Compact shall, at a minimum, comply with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, and with all rules, regulations, procedures, specifications, and standards duly adopted by the Tribal Gaming Agency.

Sec. 6.2. Tribal Ownership, Management, and Control of Gaming Operation. The Gaming Operations authorized under this Gaming Compact shall be owned solely by the Tribe.

Sec. 6.3. Prohibition Regarding Minors. (a) Except as provided in subdivision (b), the Tribe shall not permit persons under the age of 18 years to be present in any room in which Class III Gaming Activities are being conducted unless the person is en-route to a non-gaming area of the Gaming Facility.

(b) If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of 21 years from being present in any area in which Class III gaming activities are being conducted and in which alcoholic beverages may be consumed, to the extent required by the state Department of Alcoholic Beverage Control.

Sec. 6.4. Licensing Requirements and Procedures.

Sec. 6.4.1. Summary of Licensing Principles. All persons in any way connected with the Gaming Operation or Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Gaming Compact, including, but not limited to, all Gaming Employees and Gaming Resource Suppliers, and any other person having a significant influence over the Gaming Operation must be licensed by the Tribal Gaming Agency. The parties intend that the licensing process provided for in this Gaming Compact shall involve joint cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

Sec. 6.4.2. Gaming Facility. (a) The Gaming Facility authorized by this Gaming Compact shall be licensed by the Tribal Gaming Agency in conformity with the

11

requirements of this Gaming Compact, the Tribal Gaming Ordinance, and IGRA. The license shall be reviewed and renewed, if appropriate, every two years thereafter. Verification that this requirement has been met shall be provided by the Tribe to the State Gaming Agency every two years. The Tribal Gaming Agency's certification to that effect shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b) In order to protect the health and safety of all Gaming Facility patrons, guests, and employees, all Gaming Facilities of the Tribe constructed after the effective date of this Gaming Compact, and all expansions or modifications to a Gaming Facility in operation as of the effective date of this Compact, shall meet the building and safety codes of the Tribe, which, as a condition for engaging in that construction, expansion, modification, or renovation, shall amend its existing building and safety codes if necessary, or enact such codes if there are none, so that they meet the standards of either the building and safety codes of any county within the boundaries of which the site of the Facility is located, or the Uniform Building Codes, including all uniform fire, plumbing, electrical, mechanical, and related codes then in effect provided that nothing herein shall be deemed to confer jurisdiction upon any county or the State with respect to any reference to such building and safety codes. Any such construction, expansion or modification will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended, 42 U.S.C. § 12101 et seq.

(c) Any Gaming Facility in which gaming authorized by this Gaming Compact is conducted shall be issued a certificate of occupancy by the Tribal Gaming Agency prior to occupancy if it was not used for any Gaming Activities under IGRA prior to the effective date of this Gaming Compact, or, if it was so used, within one year thereafter. The issuance of this certificate shall be reviewed for continuing compliance every two years thereafter. Inspections by qualified building and safety experts shall be conducted under the direction of the Tribal Gaming Agency as the basis for issuing any certificate hereunder. The Tribal Gaming Agency shall determine and certify that, as to new construction or new use for gaming, the Facility meets the Tribe's building and safety code, or, as to facilities or portions of facilities that were used for the Tribe's Gaming Activities prior to this Gaming Compact, that the facility or portions thereof do not endanger the health or safety of occupants or the integrity of the Gaming Operation. The Tribe will not offer Class III gaming in a Facility that is constructed or maintained in a manner that endangers the health or safety of occupants or the integrity of the gaming operation.

(d) The State shall designate an agent or agents to be given reasonable notice of each inspection by the Tribal Gaming Agency's experts, which state agents may

12

accompany any such inspection. The Tribe agrees to correct any Gaming Facility condition noted in an inspection that does not meet the standards set forth in subdivisions (b) and (c). The Tribal Gaming Agency and the State's designated agent or agents shall exchange any reports of an inspection within 10 days after completion of the report, which reports shall also be separately and simultaneously forwarded by both agencies to the Tribal Chairperson. Upon certification by the Tribal Gaming Agency's experts that a Gaming Facility meets applicable standards, the Tribal Gaming Agency shall forward the experts' certification to the State within 10 days of issuance. If the State's agent objects to that certification, the Tribe shall make a good faith effort to address the State's concerns, but if the State does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of Section 9.0.

Sec. 6.4.3. Suitability Standard Regarding Gaming Licenses. (a) In reviewing an application for a gaming license, and in addition to any standards set forth in the Tribal Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Tribe's Gaming Operations, or tribal government gaming generally, are free from criminal and dishonest elements and would be conducted honestly. A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the applicant is all of the following, in addition to any other criteria in IGRA or the Tribal Gaming Ordinance:

(a) A person of good character, honesty, and integrity.

(b) A person whose prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gambling, or in the carrying on of the business and financial arrangements incidental thereto.

(c) A person who is in all other respects qualified to be licensed as provided in this Gaming Compact, IGRA, the Tribal Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe. An applicant shall not be found to be unsuitable solely on the ground that the applicant was an employee of a tribal gaming operation in California that was conducted prior to the effective date of this Compact.

Sec. 6.4.4. Gaming Employees. (a) Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license, which shall be subject to biennial renewal; provided that in accordance with Section 6.4.9, those persons may

13

be employed on a temporary or conditional basis pending completion of the licensing process.

(b) Except as provided in subdivisions (c) and (d), the Tribe will not employ or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability, or for a renewal of such a determination, has been denied or has expired without renewal.

(c) Notwithstanding subdivision (a), the Tribe may retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if: (i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially; (ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; (iii) the person is not an employee or agent of any other gaming operation; and (iv) the person has been in the continuous employ of the Tribe for at least three years prior to the effective date of this Compact.

(d) Notwithstanding subdivision (a), the Tribe may employ or retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if the person is an enrolled member of the Tribe, as defined in this subdivision, and if (i) the person holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially; (ii) the denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate the filing of the person's initial application to the State Gaming Agency for a determination of suitability; and (iii) the person is not an employee or agent of any other gaming operation. For purposes of this subdivision, "enrolled member" means a person who is either (a) certified by the Tribe as having been a member of the Tribe for at least five (5) years, or (b) a holder of confirmation of membership issued by the Bureau of Indian Affairs.

(e) Nothing herein shall be construed to relieve any person of the obligation to apply for a renewal of a determination of suitability as required by Section 6.5.6.

Sec. 6.4.5. Gaming Resource Supplier. Any Gaming Resource Supplier who, directly or indirectly, provides, has provided, or is deemed likely to provide at least twenty-five thousand dollars ($25,000) in Gaming Resources in any 12-month period, or who has received at least twenty-five thousand dollars ($25,000) in any consecutive 12-month period within the 24-month period immediately preceding application, shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or

14

further sale, lease, or distribution, of any such Gaming Resources to or in connection with the Tribe's Operation or Facility. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Supplier to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of Gaming Resources with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.

Sec. 6.4.6. Financial Sources. Any person extending financing, directly or indirectly, to the Tribe's Gaming Facility or Gaming Operation shall be licensed by the Tribal Gaming Agency prior to extending that financing, provided that any person who is extending financing at the time of the execution of this Compact shall be licensed by the Tribal Gaming Agency within ninety (90) days of such execution. These licenses shall be reviewed at least every two years for continuing compliance. In connection with such a review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the previous application. For purposes of Section 6.5.2, such a review shall be deemed to constitute an application for renewal. Any agreement between the Tribe and a Financial Source shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination, upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency. The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or has expired without renewal. A Gaming Resource Supplier who provides financing exclusively in connection with the sale or lease of Gaming Resources obtained from that Supplier may be licensed solely in accordance with licensing procedures applicable, if at all, to Gaming Resource Suppliers. The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this

15

section, financing provided by a federally regulated or state-regulated bank, savings and loan, or other federally- or state-regulated lending institution; or any agency of the federal, state, or local government; or any investor who, alone or in conjunction with others, holds less than 10% of any outstanding indebtedness evidenced by bonds issued by the Tribe.

Sec. 6.4.7. Processing Tribal Gaming License Applications. Each applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency. At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including Section 556.4 of Title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees. For applicants who are business entities, these licensing provisions shall apply to the entity as well as: (i) each of its officers and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners or partners, if an unincorporated business; (iv) each of its shareholders who owns more than 10 percent of the shares of the corporation, if a corporation; and (v) each person or entity (other than a financial institution that the Tribal Gaming Agency has determined does not require a license under the preceding section) that, alone or in combination with others, has provided financing in connection with any gaming authorized under this Gaming Compact, if that person or entity provided more than 10 percent of (a) the start-up capital, (b) the operating capital over a 12-month period, or (c) a combination thereof. For purposes of this Section, where there is any commonality of the characteristics identified in clauses (i) to (v), inclusive, between any two or more entities, those entities may be deemed to be a single entity. Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

Sec. 6.4.8. Background Investigations of Applicants. The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the applicant is qualified for a gaming license under the standards set forth in Section 6.4.3, and to fulfill all requirements for licensing under IGRA, the Tribal Gaming Ordinance, and this Gaming Compact. The Tribal Gaming Agency shall not issue other than a temporary license until a determination is made that those qualifications have been met. In lieu of completing its own background investigation, and to the extent that doing so does not conflict with or violate IGRA or the Tribal Gaming Ordinance, the Tribal Gaming Agency may contract with the State Gaming Agency for the conduct of background investigations,

16

may rely on a state certification of non-objection previously issued under a gaming compact involving another tribe, or may rely on a State gaming license previously issued to the applicant, to fulfill some or all of the Tribal Gaming Agency's background investigation obligation. An applicant for a tribal gaming license shall be required to provide releases to the State Gaming Agency to make available to the Tribal Gaming Agency background information regarding the applicant. The State Gaming Agency shall cooperate in furnishing to the Tribal Gaming Agency that information, unless doing so would violate any agreement the State Gaming Agency has with a source of the information other than the applicant, or would impair or impede a criminal investigation, or unless the Tribal Gaming Agency cannot provide sufficient safeguards to assure the State Gaming Agency that the information will remain confidential or that provision of the information would violate state or federal law. If the Tribe adopts an ordinance confirming that Article 6 (commencing with section 11140) of Chapter 1 of Title 1 of Part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this Section, the Tribal Gaming Agency shall be considered to be an entity entitled to receive state summary criminal history information within the meaning of subdivision (b)(12) of section 11105 of the California Penal Code. The California Department of Justice shall provide services to the Tribal Gaming Agency through the California Law Enforcement Telecommunications System (CLETS), subject to a determination by the CLETS advisory committee that the Tribal Gaming Agency is qualified for receipt of such services, and on such terms and conditions as are deemed reasonable by that advisory committee.

Sec. 6.4.9. Temporary Licensing of Gaming Employees. Notwithstanding anything herein to the contrary, if the applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the applicant has a criminal history or other information in his or her background that would either automatically disqualify the applicant from obtaining a license or cause a reasonable person to investigate further before issuing a license, or is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary license and may impose such specific conditions thereon pending completion of the applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine. Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary license. A temporary license shall remain in effect until suspended or revoked, or a final determination is made on the

17

application. At any time after issuance of a temporary license, the Tribal Gaming Agency may suspend or revoke it in accordance with Sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation in accordance with subdivision (d) of Section 6.5.6. Nothing herein shall be construed to relieve the Tribe of any obligation under Part 558 of Title 25 of the Code of Federal Regulations.

Sec. 6.5. Gaming License Issuance. Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a license on a conditional or unconditional basis. Nothing herein shall create a property or other right of an applicant in an opportunity to be licensed, or in a license itself, both of which shall be considered to be privileges granted to the applicant in the sole discretion of the Tribal Gaming Agency.

Sec. 6.5.1. Denial, Suspension, or Revocation of Licenses. (a) Any application for a gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the applicant is determined to be unsuitable or otherwise unqualified for a gaming license. Pending consideration of revocation, the Tribal Gaming Agency may suspend a license in accordance with Section 6.5.5. All rights to notice and hearing shall be governed by tribal law, as to which the applicant will be notified in writing along with notice of an intent to suspend or revoke the license.

(b) (i) Except as provided in paragraph (ii) below, upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall promptly revoke any license that has theretofore been issued to the person; provided that the Tribal Gaming Agency may, in its discretion, re-issue a license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court conducted pursuant to section 1085 of the California Civil Code.

(ii) Notwithstanding a determination of unsuitability by the State Gaming Agency, the Tribal Gaming Agency may, in its discretion, decline to revoke a tribal license issued to a person employed by the Tribe pursuant to Section 6.4.4(c) or Section 6.4.4(d).

Sec. 6.5.2. Renewal of Licenses; Extensions; Further Investigation. The term of a tribal gaming license shall not exceed two years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a license shall provide updated material as requested, on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or that is otherwise available to the Tribal Gaming Agency.

18

At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the applicant's continuing suitability or eligibility for a license. Prior to renewing a license, the Tribal Gaming Agency shall deliver to the State Gaming Agency copies of all information and documents received in connection with the application for renewal.

Sec. 6.5.3. Identification Cards. The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency. Identification badges must display information including, but not limited to, a photograph and an identification number that is adequate to enable agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

Sec. 6.5.4. Fees for Tribal License. The fees for all tribal licenses shall be set by the Tribal Gaming Agency.

Sec. 6.5.5. Suspension of Tribal License. The Tribal Gaming Agency may summarily suspend the license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person or entity could constitute a threat to the public health or safety or may violate the Tribal Gaming Agency's licensing or other standards. Any right to notice or hearing in regard thereto shall be governed by Tribal law.

Sec. 6.5.6. State Certification Process. (a) Upon receipt of a completed license application and a determination by the Tribal Gaming Agency that it intends to issue the earlier of a temporary or permanent license, the Tribal Gaming Agency shall transmit to the State Gaming Agency a notice of intent to license the applicant, together with all of the following: (i) a copy of all tribal license application materials and information received by the Tribal Gaming Agency from the applicant; (ii) an original set of fingerprint cards; (iii) a current photograph; and (iv) except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other completed and executed forms as have been obtained by the Tribal Gaming Agency. Except for an applicant for licensing as a non-key Gaming Employee, as defined by agreement between the Tribal Gaming Agency and the State Gaming Agency, the Tribal Gaming Agency shall require the applicant also to file an application with the State Gaming Agency, prior to issuance of a temporary or permanent tribal gaming license, for a determination of suitability for licensure under the California Gambling Control Act. Investigation and disposition of that application shall be governed entirely by state law, and the State Gaming Agency shall determine whether the

19

applicant would be found suitable for licensure in a gambling establishment subject to that Agency's jurisdiction. Additional information may be required by the State Gaming Agency to assist it in its background investigation, provided that such State Gaming Agency requirement shall be no greater than that which may be required of applicants for a State gaming license in connection with nontribal gaming activities and at a similar level of participation or employment. A determination of suitability is valid for the term of the tribal license held by the applicant, and the Tribal Gaming Agency shall require a licensee to apply for renewal of a determination of suitability at such time as the licensee applies for renewal of a tribal gaming license. The State Gaming Agency and the Tribal Gaming Agency (together with tribal gaming agencies under other gaming compacts) shall cooperate in developing standard licensing forms for tribal gaming license applicants, on a statewide basis, that reduce or eliminate duplicative or excessive paperwork, which forms and procedures shall take into account the Tribe's requirements under IGRA and the expense thereof.

(b) Background Investigations of Applicants. Upon receipt of completed license application information from the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the applicant would be suitable to be licensed for association with a gambling establishment subject to the jurisdiction of the State Gaming Agency. If further investigation is required to supplement the investigation conducted by the Tribal Gaming Agency, the applicant will be required to pay the statutory application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19941(a), but any deposit requested by the State Gaming Agency pursuant to section 19855 of that Code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any. Failure to pay the application fee or deposit may be grounds for denial of the application by the State Gaming Agency. The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs. Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the applicant would be suitable, or that the applicant would be unsuitable, for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency and, if unsuitable, stating the reasons therefor.

(c) The Tribe shall monthly provide the State Gaming Agency with the name, badge identification number, and job descriptions of all non-key Gaming Employees.

20

(d) Prior to denying an application for a determination of suitability, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard. If the State Gaming Agency denies an application for a determination of suitability, that Agency shall provide the applicant with written notice of all appeal rights available under state law.

Sec. 7.0. COMPLIANCE ENFORCEMENT.

Sec. 7.1. On-Site Regulation. It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Gaming Compact, IGRA, and the Tribal Gaming Ordinance with respect to Gaming Operation and Facility compliance, and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and the confidence of patrons that tribal government gaming in California meets the highest standards of regulation and internal controls. To meet those responsibilities, the Tribal Gaming Agency shall adopt and enforce regulations, procedures, and practices as set forth herein.

Sec. 7.2. Investigation and Sanctions. The Tribal Gaming Agency shall investigate any reported violation of this Gaming Compact and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary. The Tribal Gaming Agency shall be empowered by the Tribal Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against gaming licensees or other persons who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, the Tribal Gaming Ordinance, or this Gaming Compact. The Tribal Gaming Agency shall report significant or continued violations of this Compact or failures to comply with its orders to the State Gaming Agency.

Sec. 7.3. Assistance by State Gaming Agency. The Tribe may request the assistance of the State Gaming Agency whenever it reasonably appears that such assistance may be necessary to carry out the purposes described in Section 7.1, or otherwise to protect public health, safety, or welfare. If requested by the Tribe or Tribal Gaming Agency, the State Gaming Agency shall provide requested services to ensure proper compliance with this Gaming Compact. The State shall be reimbursed for its actual and reasonable costs of that assistance, if the assistance required expenditure of extraordinary costs.

Sec. 7.4. Access to Premises by State Gaming Agency; Notification; Inspections. Notwithstanding that the Tribe has the primary responsibility to administer and enforce the regulatory requirements of this Compact, the State Gaming Agency shall have the right to inspect the Tribe's Gaming Facility with respect to Class III Gaming Activities

21

only, and all Gaming Operation or Facility records relating thereto, subject to the following conditions:

Sec. 7.4.1. Inspection of public areas of a Gaming Facility may be made at any time without prior notice during normal Gaming Facility business hours.

Sec. 7.4.2. Inspection of areas of a Gaming Facility not normally accessible to the public may be made at any time during normal Gaming Facility business hours, immediately after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility. The Tribal Gaming Agency, in its sole discretion, may require a member of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility. If the Tribal Gaming Agency imposes such a requirement, it shall require such member to be available at all times for those purposes and shall ensure that the member has the ability to gain immediate access to all non-public areas of the Gaming Facility. Nothing in this Compact shall be construed to limit the State Gaming Agency to one inspector during inspections.

Sec. 7.4.3. (a) Inspection and copying of Gaming Operation papers, books, and records may occur at any time, immediately after notice to the Tribal Gaming Agency, during the normal hours of the Gaming Facility's business office, provided that the inspection and copying of those papers, books or records shall not interfere with the normal functioning of the Gaming Operation or Facility. Notwithstanding any other provision of California law, all information and records that the State Gaming Agency obtains, inspects, or copies pursuant to this Gaming Compact shall be, and remain, the property solely of the Tribe; provided that such records and copies may be retained by the State Gaming Agency as reasonably necessary for completion of any investigation of the Tribe's compliance with this Compact.

(b)(i) The State Gaming Agency will exercise utmost care in the preservation of the confidentiality of any and all information and documents received from the Tribe, and will apply the highest standards of confidentiality expected under state law to preserve such information and documents from disclosure. The Tribe may avail itself of any and all remedies under state law for improper disclosure of information or documents. To the extent reasonably feasible, the State Gaming Agency will consult with representatives of the Tribe prior to disclosure of any documents received from the Tribe, or any documents compiled from such documents or from information received from the Tribe, including any disclosure compelled by judicial process, and, in the case of any disclosure compelled by judicial process, will endeavor to give the Tribe

22

immediate notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(ii) The Tribal Gaming Agency and the State Gaming Agency shall confer and agree upon protocols for release to other law enforcement agencies of information obtained during the course of background investigations.

(c) Records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those records, shall be exempt from disclosure under the California Public Records Act.

Sec. 7.4.4. Notwithstanding any other provision of this Compact, the State Gaming Agency shall not be denied access to papers, books, records, equipment, or places where such access is reasonably necessary to ensure compliance with this Compact.

Sec. 7.4.5. (a) Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's land except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least 10 days' notice to the Sheriff's Department for the county in which the land is located.

(b) Transportation of a Gaming Device from the Gaming Facility within California is permissible only if: (i) The final destination of the device is a gaming facility of any tribe in California that has a compact with the State; (ii) The final destination of the device is any other state in which possession of the device or devices is made lawful by state law or by tribal-state compact; (iii) The final destination of the device is another country, or any state or province of another country, wherein possession of the device is lawful; or (iv) The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c) Gaming Devices transported off the Tribe's land in violation of this Section 7.4.5 or in violation of any permit issued pursuant thereto is subject to summary seizure by California peace officers.

Sec. 8.0. RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE TRIBAL GAMING OPERATION.

Sec. 8.1. Adoption of Regulations for Operation and Management; Minimum Standards. In order to meet the goals set forth in this Gaming Compact and required of the Tribe by law, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate, at a minimum, rules and regulations or specifications governing the following subjects, and to ensure their enforcement in an effective manner:

23